## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## EL DORADO DIVISION

RAY DANSBY                                                    PETITIONER

V.                              CIVIL NO. 1:03-cv-01146

WENDY KELLEY, Director,
Arkansas Department of Correction                            RESPONDENT

## MEMORANDUM OPINION AND ORDER

The Petitioner, Ray Dansby, was convicted of the capital murders of his ex-wife, Brenda

Dansby, and Ronnie Kimble.   Dansby was sentenced by the jury, on each charge, to death by

lethal injection.   The matter comes before this Court, on remand from the Eighth Circuit Court of

Appeals, with respect to Claims II and III of the Petitioner's second amended petition for writ of

habeas corpus.   The Court finds and orders as follows:

### I.   PROCEDURAL HISTORY

As set forth above, following a jury trial in Arkansas state court, Ray Dansby was convicted

on two counts of capital murder and sentenced to death.   After his state appeal and post-

conviction review, this Court denied Dansby's application for a writ of habeas corpus.   Following

review by the United States Court of Appeals for the Eighth Circuit ("Court of Appeals"), the

United States Supreme Court remanded the matter for further consideration by the Court of

Appeals in light of *Trevino v. Thaler*, 569 U.S. 413 (2013).

On December 11, 2014, the Court of Appeals issued a Mandate, in accordance with its

September 5, 2014 Opinion and Judgment, affirming in part, reversing in part, and remanding the

matter to this Court for further consideration.   Specifically, the Court of Appeals vacated the

dismissal of Claims II and III of the Dansby's second amended petition and remanded the case for further consideration of those claims. The Court of Appeals affirmed the dismissal of the remaining claims on appeal.

With respect to Claim II, the Court of Appeals found "that the district court erred in determining that Dansby failed to present a Sixth Amendment claim to the Arkansas Supreme Court." *Dansby v. Hobbs*, 766 F.3d 809, 823 (8th Cir. 2014). The Court of Appeals further found that "[t]he parties have not addressed the extent to which the *factual* premises of Dansby's . . . federal claim were presented to the state supreme court." The Court of Appeals instructed this Court to further consider Claim II in this regard. *Id*.

With respect to Claim III, although this Court previously dismissed Dansby's claim under *Brady-Napue* on the grounds that it was procedurally defaulted, the Court of Appeals found that the Court did not give the parties "fair notice and an opportunity to present their positions" with respect to procedural default and remanded the claim for further consideration. *Dansby*, 766 F.3d at 824.

Based on the Court of Appeals' Mandate, this Court ordered the parties to provide briefs on the remaining issues as follows:

* with respect to Claim II, the parties were to address the extent to which the *factual* premises of Claim II were presented to the state supreme court and the effect that presentation has on procedural default; and,

* with respect to Claim III, the parties were to address the issue of procedural default as to Dansby's so-called *Brady-Napue* claim. (ECF No. 140).

The parties' briefs have been filed and this matter is now ripe for decision.

## II.  FACTS

In adjudicating Dansby's direct appeal, the Supreme Court of Arkansas set forth a summary of the presented evidence.   Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct."   Although this presumption may be rebutted by Dansby, the Court finds that Dansby has not done so.  Thus, as determined by the Arkansas Supreme Court, the facts are as follows:

> The facts as related by the various witnesses are these. On the morning of August 24, 1992, Brenda Dansby left her residence at 1402 North Roselawn in El Dorado to go to the store to get her eight-year-old son, Justin, some orange juice, as he was sick with a cold. Brenda's boyfriend, Ronnie Kimble, was sleeping on a couch in the living room, while Justin was seated in a red chair in the same room watching television. According to Justin, his father, Appellant Ray Dansby, came around the side of the house to the front yard as his mother was pulling up into their driveway in her car. Ray ordered her to get out of the car twice before she complied. Justin looked out the screen door and watched as his father "had my mother like a shield" then "shot [her] in the arm and then in the neck." Ray then came in the house, and, according to Justin, it was after Ray shot Ronnie in the chest that Ronnie got his gun, which was located underneath the couch, and positioned himself behind it. Justin had returned to his seat on the red chair, and "was afraid I was going to get shot so I lifted my feet up." Justin further testified that he heard "clicking noises" and that Ronnie shot his gun, but that, to his knowledge, the weapon never did fire. Ray then chased Ronnie through a straight hallway to Justin's room in the back of the house, and thereafter, Justin heard about five more shots. It was Justin's testimony that he retreated to his mother's room to see what had happened, and saw his father standing by Ronnie, observed him kick Ronnie twice, and heard Ray say something to him, though he could not remember what it was. As Justin exited the house, he saw his mother, who "had blood all over her neck" and "wasn't moving." He then left with his father, and the two walked down the road, and when they separated, Justin called the police from another residence.
>
> Greg Riggins, Brenda's neighbor who lived across the street, testified that he was in bed when he heard shots, at which time he jumped up and went to his front door, where he witnessed Brenda and Ray struggling with a revolver. He watched as Ray, who was standing directly behind Brenda, hit her in the back with his fist, knocking her down into the corner of the house. According to Mr. Riggins, Ray got the gun away from Brenda, stood two or three feet away from her, and shot two rounds consecutively, knocking her flat on the ground. As Brenda tried to sit up, Ray discharged another shot, which Mr. Riggins believed missed Brenda. It was Mr.

Riggins testimony that "then after maybe five or six seconds he paused and the next shot went off. I assume he hit her in the head and her head launched and she went flat." Mr. Riggins stated that Justin was standing by the second post at the front of the house and witnessed his mother's murder. He further testified that, while he did not see any shots coming from the house, Ray ducked and hesitated before firing a shot, then went into the house after someone inside.

Several El Dorado police officers were dispatched to the residence at approximately 8:28 a.m., one of whom was Officer Larry Weaver. He arrived at the scene to find Brenda's body outside, and Ronnie injured on the floor in the back bedroom, who was attempting to crawl and had a .38 automatic pistol laying under him which was jammed and opened where it would not work. Ronnie died several days later at an area hospital, after telling Detective Carolyn Dykes that Ray had shot him. Shortly thereafter, Officer Mike Stegall located Ray walking on a nearby street, at which point Ray flagged him down, stating that "I'm Ray Dansby, ya'll are looking for me." When Officer Stegall inquired as to whether he had any guns on him, Ray replied that he had thrown them away. After being transported to the police station, Ray was verbally advised of his rights by Lieutenant Mike Hill, then stated that he left the scene with a .32 revolver and a .38 revolver, which he threw away where officers would never find them. Ray further stated to the officers that he took the weapons to Brenda's residence because he knew that she had a .38 and that Ronnie had a handgun of some type. According to Ray, upon his arrival at the residence, he walked in the front door, where he was met by Ronnie, who was holding a handgun in his right hand "pointed down." After an argument or discussion erupted, Ray said, "I just pulled my gun and started shooting." After making these statements and submitting to a gunshot residue test, Ray signed a written rights waiver form, but refused to give a taped statement.

Lt. Hill stated that he was present when a .38 Interarms blue steel revolver was recovered under a manhole cover in the bottom of a drainage ditch on a street approximately three to four blocks from Brenda's residence. At the time of recovery, the weapon, which was registered to Brenda, had five expended cartridge cases in the cylinder.

Sergeant Ricky Roberts testified that, along with a set of car keys, a purse, and a gun carrying case, four .32 caliber live rounds of ammunition were found under Brenda's body. Additionally, seven rounds of .38 caliber ammunition were laying around her body, and another .38 round was found on the porch. Inside, Sgt. Roberts stated that there was blood behind and on the back of the couch in the living room, as well as on a dress on an ironing board and on some houseshoes which were both located behind the couch. A silver-tipped round .38 bullet was also recovered from behind the couch, similar to two rounds found in the clip and the one jammed inside the .38 Colt automatic which was recovered near Ronnie, but different from the other .38 rounds recovered.

Ann Hoff, a criminalist with the State Crime Lab, analyzed the gun shot residue kit taken from Ray, and found residue on both his hands. She received a kit submitted on Brenda by the medical examiner's office, and also received positive results, explaining that residue found on her hands would be consistent with a struggle over the gun if it had gone off, with her hands being held up while being shot, or with her firing the gun.

Dr. Frank Peretti, Associate Medical Examiner with the State Crime Lab, performed autopsies on both victims and testified that on Brenda's body, he located gunshot wounds near the left ear and upper chest. On Ronnie's body, he observed gunshot wounds behind the left ear, chest, left upper back, right arm, and two superficial wounds on the left flank. It was Dr. Peretti's opinion that Ronnie was "probably bent over" when he was shot in the back, and that the cause of death was pneumonia complicating multiple gun shot wounds.

Berwin Monroe, a firearms expert with the State Crime Lab, testified that three of the four bullets recovered from Ronnie's body were of the .32 caliber class, and that the fourth bullet was fired from Brenda's gun, the .38 Interarms blue steel revolver. It was Mr. Monroe's testimony that the bullet recovered from Brenda's chest and the fragments recovered from her head were also fired from her gun.

Lisa Bridges, a receptionist at the prosecutor's office, testified that she notarized an affidavit signed by Brenda on August 3, 1992, which she passed on to the deputy prosecutor, who in turn filed charges against Ray. Paula Henderson, the chief deputy clerk for the municipal court, confirmed that Ray was scheduled to appear at 9:00 a.m. on the day of the murders on charges of assault in the second degree and contempt of court. Officer James Morrow testified that on July 21, 1992, he was dispatched to Brenda's residence after she had complained that an unwanted person, Ray Dansby, was there. At destination, he observed Brenda and Ray talking out in the yard, and recalled that as Brenda had a gun between the seats of her car, he advised her that she needed to keep it in her house. Officer Morrow further testified that he advised Ray that he needed to leave the property, that he was not to return, and that Ray left without further incident.

At trial, Larry McDuffie, a witness for the State, testified that Ray, who was his girlfriend's half-brother, confessed to committing the murders while they were in jail together on August 24, 1992. According to McDuffie, Ray stated that he went to Brenda's residence after she refused to "take those papers off of him," referring to his pending municipal charges, as "he wasn't going to go to jail for nothing this time."

*Dansby v. State*, 893 S.W.2d 331, 333-35 (Ark. 1995).   Additional particular facts will be

referenced herein as they relate to the individual grounds for relief addressed in this order.

### III.   CLAIM II – CONFRONTATION CLAUSE

In Claim II of Dansby's second amended petition, Dansby asserts that the state trial court denied his right under the Sixth Amendment to confront a witness against him, Larry McDuffie. This Court previously dismissed the claim on the grounds that it was procedurally defaulted, concluding that Dansby never presented this claim of federal constitutional error in his direct appeal to the state supreme court.   The Court of Appeals, however, found that Dansby sufficiently presented the *legal* premises of his claim under the Sixth Amendment:

> [o]n direct appeal, Dansby challenged the trial court's restrictions on cross-examination, arguing in part that McDuffie's 'past dealing with law enforcement, including all the surrounding circumstances of his past criminal record and the penalties or rewards he received, were relevant to the jury's consideration of the testimony he would give at the trial.'   Dansby urged, among other things, that the trial court's right to limit testimony 'must be weighed against the defendant's confrontation rights and fair trial rights guaranteed by the Sixth Amendment.'

(ECF No. 133 at 16).   The Eighth Circuit, however, went on to find that the parties had not addressed the extent to which the *factual* premises of his claim were presented to the state supreme court.   The Court of Appeals therefore vacated the dismissal of Dansby's Sixth Amendment claim and remanded it to this Court for further consideration.

According to the briefs of the parties, Dansby will forego reliance on any facts not presented in the state trial court record in order to ensure that the claim is not procedurally defaulted.   Further, the Respondent concedes that the Confrontation Clause claim was fairly presented to the state courts and is *not* procedurally defaulted.   Given the parties' positions and the Court's review of Dansby's factual arguments during his direct appeal to the Arkansas Supreme Court, the Court finds that Dansby's Confrontation Clause claim was fairly presented to

the state court.

"The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). "'The main and essential purpose of confrontation is to *secure for the opponent the opportunity of cross-examination.*'" *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974)(quoting 5 J. Wigmore, Evidence § 123 (3d ed. 1940)(emphasis in original). A violation of the Confrontation Clause is established by a showing that a criminal defendant "was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Van Arsdall*, 475 U.S. at 680.

In accordance with the Sixth Amendment's Confrontation Clause, a defendant has the right to elicit enough facts about a witness' "possible biases, prejudices, or ulterior motives" to let the jury assess witness credibility. *Davis v. Alaska*, 415 U.S. at 316. "[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id*. at 316-17.

However, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679. "[T]he Confrontation Clause guarantees an *opportunit*y for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)(emphasis in original).

Further, in order for a violation of the Confrontation Clause to be found, there must be a

showing that "[a] reasonable jury might have received a significantly different impression" of a witness' credibility if counsel had been permitted to pursue the proposed line of cross-examination. *Van Arsdall*, 475 U.S. at 680.

### A. Standard of Review

Although both parties agree - and argue - that the Confrontation Clause claim is not procedurally defaulted, the parties disagree on the standard of review which should be given the claim.

#### 1. De Novo Review

Dansby contends that although he presented his federal Confrontation Clause claim to the Arkansas Supreme Court, the Arkansas Supreme Court did not adjudicate the Confrontation Clause claim and instead addressed only a related state-law claim. Because he argues the Confrontation Clause claim was not adjudicated, Dansby contends that 28 U.S.C. § 2254(d) does not require deference to the Arkansas Supreme Court's direct appeal opinion, but that this Court should conduct a *de novo* review of the claim. Finally, Dansby contends that this Court should grant habeas relief based on a prejudicial violation of his Confrontation Clause rights.

#### 2. Merits

The Respondent contends the claim should be subject to § 2254 merits based review, giving deference to the state court's ruling denying relief. When the merits of a claim presented in a habeas action have been addressed in state court proceedings, the habeas court cannot grant habeas corpus relief upon the claim unless it determines that the state court proceedings resulted in a decision that (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

To find that a decision is contrary to clearly established federal law, a habeas court must find that the state court decision directly contradicts Supreme Court precedent or if, when faced with "materially indistinguishable" facts, the state court reached a decision that was opposite to a result reached by the Supreme Court. *Kinder v. Bowersox*, 272 F.3d 532, 537-38 (8th Cir. 2001). With respect to the reasonableness requirement, the petitioner must show that the state court decision is "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000)(O'Connor, J., concurring in part). Although a state court's application of federal law might be mistaken in this Court's independent judgment, that does not mean that it is objectively unreasonable. *Id.* at 411-13. Relief is warranted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

### 3. Harmless Error

The Respondent further contends that any Confrontation Clause error was harmless, both as to Dansby's guilt and as to his two capital sentences. In § 2254 proceedings, a court must assess the prejudicial impact of any constitutional error. *See Fry v. Pliler*, 551 U.S. 112, 121-122 (2007). Under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), "the standard for determining whether habeas relief must be granted is whether the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). According to the Eighth Circuit in *Christenson v. Ault*, "[a] 'substantial and injurious effect' occurs when a court finds itself in 'grave doubt' about the

effect of the error on the jury's verdict." 598 F.3d 990, 994-95 (8th Cir. 2010). Further, "'grave doubt' exists when the issue of harmlessness is 'so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error.'" *Id*. at 995 (citing *Chang v. Minnesota*, 521 F.3d 828, 832 (8th Cir. 2008)).

In *Delaware v. Van Arsdall*, the Supreme Court, reviewing the prejudice caused by a Confrontation Clause error, found several factors important for reviewing courts to use in assessing prejudice: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." 475 U.S. at 684. *See also Yang v. Roy*, 743 F.3d 622, 628-29 (8th Cir. 2014).

## B. Analysis

As set forth above, the parties disagree on the standard of review this Court should give Dansby's Confrontation Clause claim. The parties do agree that the claim was presented to the state court and was not procedurally defaulted. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principle to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). *See also Johnson v. Williams*, 568 U.S. 289, 298 (2013)(applying presumption of merits review where the state court addressed some but not all of a defendant's claims). However, this presumption is rebuttable. According to *Johnson*,

> If the state-law rule subsumes the federal standard – that is, if it is at least as
> protective as the federal standard – then the federal claim may be regarded as having

been adjudicated on the merits. But what if, for example, in at least some circumstances the state standard is *less* protective? Or what if the state standard is quite different from the federal standard, and the defendant's papers made no effort to develop the basis for the federal claim? What if a provision of the Federal Constitution or a federal precedent was simply mentioned in passing in a footnote or was buried in a string cite? In such circumstances, the presumption that the federal claim was adjudicated on the merits may be rebutted – either by the habeas petitioner (for the purpose of showing that the claim should be considered by the federal court *de novo*) or by the State (for the purpose of showing that the federal claim should be regarded as procedurally defaulted).

568 U.S. at 301 (citations omitted).

Although the Respondent argues that the presumption should be applied and a finding should be made that the Arkansas Supreme Court adjudicated Dansby's Confrontation Clause claim on the merits, Dansby counters that the facts suggest that the Arkansas Supreme Court overlooked his Confrontation Clause claim.

The opinion of the Arkansas Supreme Court sets forth the following with respect to the Confrontation Clause claim:

Larry McDuffie testified that Ray Dansby confessed to him about the murders while both were in jail, as follows. He took a .32 caliber revolver with five extra bullets to Brenda's residence on the day in question, and upon his arrival, Brenda told him that she "wasn't going to take the papers off so he might as well leave," and Ronnie told him to leave too. He then shot Ronnie twice in the chest with the .32, grabbed Brenda around the neck, shot her, and took her gun. Ronnie then found out his gun wouldn't shoot, so he ran behind the couch, and Ray shot twice in that direction. When Ronnie ran, he "shot him once in the back or the ass somewhere," and Ronnie fell in "the kid's room." He then walked up to Ronnie and kicked him once, shot him, kicked him two more times, then shot him again, stating, "you die mother f-----." After going outside to Brenda, she pleaded, "well Ray please don't kill me," to which he replied, "well b---- you done f----- up cause I'm not gonna leave you out here in these streets when I done killed this man inside." He then put the pistol to her head and "blowed her brains out."

According to McDuffie, Ray stated that he was "just glad" Brenda was dead, and that "she was playing both ends against the middle and he just got tired of it." Ray further commented that Ronnie's gun never did fire, that Brenda's gun was in her purse, and that he should have picked up and fired Ronnie's gun at the door to make

it look like self-defense.

Dansby argues that the trial court erred in excluding evidence of all prior criminal activity of McDuffie, thereby precluding Dansby from presenting a complete picture on the issues of bias and credibility, as Dansby was attempting to prove that McDuffie, while in jail, was acting as a police informant, and in this capacity, solicited Ray's confession. There were numerous motions filed prior to trial by each side relating both to the admissibility of McDuffie's testimony, and to what the State was required to disclose to Dansby in terms of McDuffie's prior dealings with police.

After hearing Dansby's request to admit certain jail records and booking cards in an attempt to show that McDuffie had received preferential treatment after being arrested and was thus biased in favor of the State, the court issued a detailed ruling on this issue, finding that any evidence of guarantees of immunity or promises of leniency were proper subjects for cross-examination, which was fully exercised by Dansby, but that in the absence of any direct evidence of such an agreement or promise, no extrinsic evidence would be allowed.

As to the credibility issue, the trial court's ruling was right on the mark. As we stated recently in *Biggers v. State*, 317 Ark. 414, 878 S.W.2d 717, Arkansas Rule of Evidence 608(b) governs the credibility question, which states as follows:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, *may not be proved by extrinsic evidence*. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination....

(Emphasis added.)

In *Biggers*, a witness for the State admitted on cross-examination that he had previously lied to his supervisors at work which resulted in suspension, and that he had been the subject of an investigation for theft of property. We stated that Rule 608(b) expressly prohibits the introduction of extrinsic evidence to prove such misconduct, even if the witness denied the event. *Biggers v. State*, supra.

The trial court was likewise correct in its ruling dealing with reference to the issue of proof to show bias. Granted, we have said that a matter is not collateral if the evidence is relevant to show bias, knowledge or interest. See *Pyle v. State*, 314 Ark. 165, 862 S.W.2d 823 (1993), cert. denied, 510 U.S. 1197, 114 S.Ct. 1306, 127 L.Ed.2d 657 (1994). Stated another way, if a witness denies or does not fully admit the facts claimed to show bias, the attacker has a right to prove those facts by

extrinsic evidence. *Wood v. White*, 311 Ark. 168, 842 S.W.2d 24 (1992).

Here, Dansby was allowed to explore the area of bias in his cross-examination of McDuffie as a witness. He did not deny that he had been a confidential informant for the police, and further admitted that he had signed a contract with law enforcement. Dansby asserts, however, that he proffered "substantial testimony" of McDuffie's bias that the jury should have been allowed to hear. The proffered testimony was as follows. Paula Henderson, the chief deputy clerk with the Union County Municipal Court, testified that she could not tell whether bond was set for Mr. McDuffie's felony charge for which he had been incarcerated at the time of Dansby's alleged confession, nor could she determine whether bond had been set or a plea had been entered on subsequent misdemeanor charges. Calvin Leveritt, a probation officer, testified that there was no indication from the records as to whether McDuffie had a first appearance on subsequent misdemeanor charges, whereas Officer Terry Davis with the El Dorado Police Department testified that he had made the arrests and that McDuffie was to be so held. W.D. Brewster, an administrator of the Union County Jail, testified that a booking card for a subsequent misdemeanor offense reflected the notation, "Hold for Detectives," and allowed for McDuffie's release on his own recognizance.

In making its ruling, the trial court observed that while McDuffie advised the authorities of Dansby's confession to him only a few days after the murders, none of the extraneous evidence which Dansby sought to admit into evidence took place prior to McDuffie's relating Dansby's statement to the authorities. We agree with the trial court's assessment that the proffered testimony falls short of direct evidence of an agreement or promise of immunity, and that the admission of McDuffie's subsequent arrests on misdemeanor charges through booking cards and jail records "would call upon the jury to perform a feat of speculation or conjecture in order to relate it to [the] alleged bias." In sum, Dansby's proffered evidence was not relevant to show bias, and the trial court's well-reasoned ruling was correct.

*Dansby v. State*, 893 S.W.2d 331, 338 (Ark. 1995).

The Arkansas Supreme Court quoted Arkansas Rule of Evidence 608(b) and found "[a]s to the credibility issue, the trial court's ruling was right on the mark." *Dansby*, 893 S.W.2d at 338. With respect to the issue of bias, the Arkansas Supreme Court cited to state law, focusing on the admission of *extrinsic evidence* and noted that Dansby *was allowed* to explore the area of bias in his cross-examination of McDuffie as a witness. *Dansby*, 893 S.W.2d at 339.

As this Court has previously found, the Arkansas Supreme Court did not address any

federal or constitutional laws in reviewing the merits of Dansby's impeachment claim. Because the state law cited is *not* on par with the protections provided by the Confrontation Clause, this Court finds that the presumption that the Arkansas Supreme Court adjudicated the claim on the merits is rebutted.[1]

This Court will, therefore, apply *de novo* review to the claim.

### 1. *De Novo* Review

According to the state court record, Larry McDuffie was an inmate in the local jail where Dansby was held following his arrest. As set forth above, McDuffie testified that Dansby confessed to him about the murders while they were both in jail.

Prior to Dansby's trial, the State filed a Motion in Limine "request[ing] that the Defendant be prohibited from mentioning or attempting to elicit testimony from any witness regarding the reason for McDuffie's incarceration, and pending charges or attendant matters." (ECF No. 15-1 at 81). The Motion in Limine cited to Arkansas Rules of Evidence 608, 609, 401, 402, and 403. (*Id.*).

Dansby's defense counsel opposed the Motion, arguing that he should be allowed to "inquire of . . . McDuffie as to his bias." (ECF No. 15-1 at 102). The defense argued that McDuffie was, over a long period of time, treated favorably with respect to his criminal matters, including during the time period just after McDuffie's report of Dansby's confession to authorities

---

[1] "'A primary interest secured by the Confrontation Clause is the right of cross-examination. The opportunity to expose 'possible biases, prejudices, or ulterior motives' of a witness, as 'they may relate directly to the issues or personalities in the case at hand' is one important function of the right to confront witnesses. Thus, the Confrontation Clause may require the admission of certain evidence otherwise excluded by the rules of evidence . . . .'" *U.S. v. Frederick*, 683 F.3d 913, 918 (8th Cir. 2012)(quoting *United States v. Tail*, 459 F.3d 854, 859-60 (8th Cir. 2006)). Here the trial court primarily referred to the Arkansas Rules of Evidence in reaching its conclusions. The Arkansas Rules of Evidence are similar, but not identical to the Federal Rules of Evidence.

and continuing to the time leading up to Dansby's trial. The defense continued that it wished to cross-examine McDuffie about a felony charge pending against him and "un-filed" charges stemming from a recent violation of his pre-trial release agreement and from a recent stabbing at a local bar. Specifically, the defense argued that this favorable treatment made McDuffie biased towards the state and sought to examine *how* McDuffie's criminal matters were being handled by local authorities in an attempt to show that McDuffie was biased in favor of the State. (ECF No. 15-1 at 102-106). Dansby argued that he was entitled to cross-examine McDuffie about these matters under his confrontation rights guaranteed by the Sixth Amendment to the United States Constitution. (ECF No. 15-1 at 104-105).

In arguments to the trial court, Dansby's counsel presented evidence that both at the time McDuffie was housed in the jail with Dansby, and at the time of his testimony against Dansby, McDuffie had a felony possession of cocaine charge pending against him. The cocaine charge against McDuffie was filed by the same prosecutor's office that was prosecuting Dansby.

Dansby's counsel also presented evidence that just months before McDuffie testified against Dansby at trial, he had been arrested for disorderly conduct, public intoxication, and violating the conditions of his pretrial release. With respect to those charges, McDuffie was released on his own recognizance; and, the charges, filed by the same prosecutor's office that was prosecuting Dansby, remained pending at the time of McDuffie's trial testimony.

Additionally, just prior to Dansby's trial, McDuffie was arrested again – this time for public intoxication, battery, and again violating the terms of his pretrial release. McDuffie was not jailed as a result of this arrest; but, he was charged, by the same prosecutor's office that was prosecuting Dansby, with third-degree battery and another violation of his pretrial release. These

charges were pending at the time of his testimony at Dansby's trial.

The trial court granted the State's Motion in Limine and ruled that "any charges that have been filed in the past against Mr. McDuffie that have not resulted in convictions" are "clearly inadmissible and should not be referred to." (ECF No. 15-3 at 75). While the trial court did allow McDuffie to be asked about any agreements to serve as a confidential informant or agreements of leniency, the court found that the "extraneous and extrinsic evidence" Dansby offered to prove an agreement of leniency was not "directly probative" and therefore not proper. (ECF No. 15-3 at 76). The Court also noted that none of the "extraneous matters" took place *prior to* McDuffie's initial statement to the police. (ECF No. 15-3 at 77). Finally, when Dansby's counsel asked McDuffie on the witness stand at trial why he had been in jail at the time of Dansby's confession, the trial court sustained the prosecutor's objection and McDuffie was not required to answer. (ECF No. 15-4 at 111).

Cross-examination is "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal," *Pointer v. Texas*, 380 U.S. 400, 405 (1965), and "is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).

> The Supreme Court has held that ordinary rules of evidence must give way when they prevent a defendant from presenting evidence central to the defense, including through cross-examination. *Olden*, 488 U.S. at 232; *Van Arsdall*, 475 U.S. at 679-80; *Davis*, 415 U.S. at 319 (finding state's interest in maintaining anonymity of juvenile offenders was "outweighed by petitioner's right to probe into the influence of possible bias" through cross-examination); *see also Chambers*, 410 U.S. at 295-98 (finding that state could not apply common-law evidentiary rule to limit cross-examination of key witness); *id*. at 302 (finding that hearsay rule cannot be applied mechanistically when it undermines fundamental elements of defense).

*Rhodes v. Dittmann*, 903 F.3d 646, 656 (7th Cir. 2018). Further, "trial courts cannot routinely

apply Rule 403 balancing to prevent defendants from cross-examining witnesses on issues central to the case." *Rhodes,* 903 F.3d at 655-56 (citing *Olden v. Kentucky*, 488 U.S. 227 (1988), and *Delaware v. Van Arsdall*, 475 U.S. 673 (1986)).

Both sides have represented their respective sides well after this case was remanded by the Eighth Circuit. You could not make a script that would reflect more brutal and callous murders than the ones in this case. Dansby was convicted by a jury for the offenses, and that same jury determined that Dansby should be sentenced to death. However, imposition of the death penalty was based in part upon the testimony of McDuffie, a jail house informant who apparently now would recant his testimony which often occurs with informants.[2] The question, usually, is not whether an informant will recant his or her testimony, but when.[3] If the defense had been permitted more latitude in the cross-examination of the informant, the informant *may* have even altered his testimony during the trial. The trial court's rulings relevant to Dansby's Confrontation Clause claim prohibited Dansby's counsel "from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Van Arsdall*, 475 U.S. at 680. The rulings prevented the jury from hearing the serious charges pending against McDuffie; and, the fact that despite the serious charges and repeated violations of his

---

[2] Dansby's *Brady-Napue* claim is based in part on a statement purportedly signed by McDuffie in 2005, in which McDuffie recants his trial testimony and accuses the prosecution of directing him to testify in a manner that he told the authorities was not true.

[3] The Court notes that other courts and legal scholars have discussed the inherent unreliability of jailhouse informants. *Zappulla v. New York*, 391 F.3d 462, FN. 3 (2nd Cir. 2004); Russell D. Covey, Article, *Abolishing Jailhouse Snitch Testimony*, 49 Wake Forest L. Rev. 1375 (Winter, 2014); Daryl K. Brown, Essay, *Rationing Criminal Defense Entitlements: An Argument From Institutional Design*, 104 Colum. L. Rev. 801, 824 (2004); Jana Winograde, Comment, *Jailhouse Informants And The Need for Judicial Use Immunity in Habeas Corpus Proceedings*, 78 CAL L. REV 755, 756 (1990); Comm'n on Capital Punishment, Report of the Governor's Commission on Capital Punishment 96, 120, 158 (202).

The nature of jailhouse informant testimony makes broad cross-examination, specifically with respect to the issue of bias, imperative. Broad cross-examination with respect to bias could also potentially prevent later retraction of trial testimony – as is alleged here.

pretrial release, McDuffie had often avoided jail time[4] and possibly received "special treatment" during the time leading up to his trial testimony. Had the proposed line of cross-examination been allowed, the jury certainly could have concluded that McDuffie had reason to be biased for the prosecution in an effort to secure continued favorable treatment with respect to his pending charges. *See Davis v. Alaska*, 415 U.S. 308, 318 (1974)(finding court's allowed questioning about whether a witness was biased was not enough: "[w]hile counsel was permitted to ask [the witness] whether he was biased, counsel was unable to make a record from which to argue why [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial"). Additionally, although the trial court found that none of the extraneous evidence Dansby's counsel sought to introduce to show possible bias took place prior to McDuffie's report of Dansby's confession to the authorities, the evidence *is* relevant to McDuffie's potential bias because it occurred prior to his trial testimony.

For these reasons, the Court finds Confrontation Clause error with respect to Dansby's cross examination of McDuffie.

## 2. Harmless Error

As set forth above, in § 2254 proceedings, a court must assess the prejudicial impact of any constitutional error. *See Fry v. Pliler*, 551 U.S. 112, 121-122 (2007). Under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), "the standard for determining whether habeas relief must be granted is whether the . . . error 'had substantial and injurious effect or influence in determining

---

[4] The Court understands the trial court's potential hesitancy to allow extraneous testimony concerning the handling of McDuffie's various criminal charges and violations of his pretrial release status. Obviously, evidence that appears to show a "lenient" handling of McDuffie's case would prompt rebuttal evidence by the State to show that the handling of McDuffie's situation was within the norm – potentially creating a confusing side show centering on McDuffie and Union County criminal procedures. However, given the nature of the charges against Dansby and the potential for the death sentence, Dansby's constitutional right to confrontation must supersede any inefficiency in the process.

the jury's verdict.'" *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). According to the Eighth Circuit in *Christenson v. Ault*, "[a] 'substantial and injurious effect' occurs when a court finds itself in 'grave doubt' about the effect of the error on the jury's verdict." 598 F.3d 990, 994 (8th Cir. 2010). Further, "'grave doubt' exists when the issue of harmlessness is 'so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error.'" *Id.* (citing *Chang v. Minnesota*, 521 F.3d 828, 832 (8th Cir. 2008)).

In *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), the Supreme Court reviewing the possible prejudice caused by a Confrontation Clause error found several factors important for use in assessing prejudice: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." 475 U.S. at 684. *See also Yang v. Roy*, 743 F.3d 622, 628-29 (8th Cir. 2014).

The Court will analyze the prejudicial impact of the Confrontation Clause error with respect to both Dansby's conviction and sentence.[5]

### a. Conviction

Here, using the factors established by the Supreme Court, this Court finds that the effect of the Confrontation Clause error was harmless with respect to the guilt phase of Dansby's trial. Although McDuffie's testimony that Dansby admitted to planning the murders *was* significant

---

[5] McDuffie testified as the last witness for the State during the conviction phase of Dansby's trial. McDuffie did not testify during the sentencing phase of trial. However, "[a]ny evidence admitted at trial relevant to punishment may be considered by the jury without the necessity of reintroducing the evidence at the sentencing proceeding." *See* Ark. Code Ann. § 5-4-602(4)(D)(previously codified at A.S.A. § 1947, §41-1301).

with respect to the deliberate and premeditated nature of the crime, much of McDuffie's testimony in this regard was cumulative.    In addition to McDuffie's testimony, Dansby's capital conviction was supported by: eyewitness testimony from Justin Dansby and Greg Riggins; Ronnie Kimble's report to a detective that Dansby shot him before he died; Dansby's confession; and, forensic evidence.    As set forth by the state court:

> there was much said as to the weapons used, and as to the nature, extent, and location of Ms. Dansby's and Mr. Kimble's wounds.    With reference to the shots fired into Brenda, Dr. Peretti testified that he located gunshot wounds near the left ear and upper chest of her body. Greg Riggins, an eye witness to Brenda's murder, testified as to Ray's hesitation of several seconds before he fired the final shot into Brenda's head.    In observance of the wounds to Ronnie's body, Dr. Peretti testified that Ronnie sustained wounds to the left ear, chest, left upper back, and right arm, as well as two superficial wounds to the left flank. Particularly, it was Dr. Peretti's opinion that the wound to Ronnie's back occurred when he was "probably bent over."    Ray's son Justin, another eye witness, testified that he watched as his father kicked Ronnie twice, and that he heard his father say something after shooting him. In light of this testimony, the jury could have easily inferred that Dansby fired multiple shots into both victims in a premeditated and deliberated manner.

*Dansby v. State*, 893 S.W.2d 331, 336 (Ark. 1995).

Given the overall strength of the prosecution's case, this Court simply does not have "grave doubt" about the effect of the error on the jury's verdict with respect to Dansby's conviction.    *See Dansby,* 766 F.3d at 817 ("we agree with the Arkansas Supreme Court that there was substantial evidence apart from McDuffie's testimony that permitted a jury to infer that Dansby killed the victims in a premeditated and deliberate manner").

### b. Sentence

However, with respect to Dansby's sentence, the Court finds the error had a substantial and injurious effect on the jury's verdict.    McDuffie's testimony was the only evidence that supported the aggravating circumstance that Dansby committed the murders in an especially depraved

manner.[6]  Further, the prosecutor emphasized McDuffie's testimony heavily during her closing arguments of the sentencing phase.   During the prosecutor's closing argument of the sentencing phase she argued that "according to Larry McDuffie, [Dansby] bragged about it . . . [h]e took two lives and it didn't mean anything to him.   No remorse.   None whatsoever."   (ECF No. 15-5 at 196).   The prosecutor's admitted reliance on McDuffie's testimony with respect to the aggravating factors suggests the importance of the testimony.   *See Banks v. Dretke*, 540 U.S. 668, 700 (2004) ("The stress placed by the prosecution on this part of Farr's testimony, uncorroborated by any other witness, belies the State's suggestion that 'Farr's testimony was adequately corroborated.'").

Further, the jury found no mitigating factors to balance against the aggravating circumstances.   The Court finds "grave doubt" as to whether, with a full cross examination of McDuffie, the jury would have found the same.   The Court further finds "grave doubt" as to whether, with a full cross examination, the jury would have found that the aggravating factors warranted a sentence of death.   For all of these reasons, the Court finds that the Confrontation Clause error was not harmless with respect to Dansby's sentence.

## IV.   CLAIM III – *BRADY-NAPUE* CLAIM

In Claim III of Dansby's second amended petition Dansby asserts prosecutorial misconduct with respect to two related allegations: 1) that the State violated the rule of *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding material exculpatory evidence regarding the credibility of

---

[6] The jury unanimously found three aggravating circumstances: that Dansby previously committed another felony an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person; that in the commission of the capital murder, Ray Dansby knowingly created a great risk of death to a person other than the victim; and, that the capital murder was committed in an especially cruel or depraved manner.   (ECF No. 15-5 at 208).   The jury found no mitigating circumstances.

Larry McDuffie; and, 2) that the State violated Dansby's right to due process by knowingly permitting McDuffie to testify falsely. *See Napue v. Illinois*, 360 U.S. 264 (1959). This Court previously dismissed Dansby's *Brady-Napue* claim on the ground that it was procedurally defaulted. In a motion to alter or amend the judgment, Dansby complained that the court had raised the doctrine of procedural default *sua sponte* without giving the parties appropriate notice and an opportunity to be heard. The Eighth Circuit held that although the Court may raise the issue of procedural default *sua sponte*, it must give the parties fair notice and an opportunity to present their positions. *Dansby v. Hobbs*, 766 F.3d at 824 (citing *Wood v. Milyard*, 132 S.Ct. 1826, 1834 (2012); *Day v. McDonough*, 547 U.S. 198, 210 (2006)). The Court of Appeals therefore vacated the dismissal of Dansby's *Brady-Napue* prosecutorial misconduct claims and remanded it to this Court for further consideration.

### A. Facts and Underlying Law

In Dansby's *Brady-Napue* claim, he

> contends that the prosecution concealed various unwritten inducements it had offered McDuffie in exchange for his testimony. These inducements included, he asserts, a favorable sentencing recommendation in McDuffie's pending felony drug case and nonenforcement of the conditions of his probation. Dansby also relies on a statement purportedly signed by McDuffie in 2005, in which he recants his trial testimony and accuses the prosecution of directing him to testify in a manner that he told the authorities was not true.

*Dansby v. Hobbs*, 766 F.3d 809, 823 (8th Cir. 2014).

In order to prove a violation under *Brady*, three elements are required: "'(1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.'" *Larimore v. State*, 17 S.W.3d 87, 91 (Ark.

22

2000) (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)).

Under *Napue*, a conviction obtained through the knowing use of false testimony is a violation of the Fourteenth Amendment. Relief is warranted if there is "any reasonable likelihood" that the testimony could have affected the judgment of the jury. *United States v. Foster*, 874 F.2d 491, 495 (8th Cir. 1988).

## B. Procedural Default

As a matter of comity, before a federal court can grant habeas relief, it must first determine that the petitioner has exhausted all of his state court remedies. According to *Coleman v. Thompson*, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." "[A] claim has not been fairly presented to the state courts unless the same factual grounds and legal theories asserted in the prisoner's federal habeas petition have been properly raised in the prisoner's state court proceedings." *Krimmel v. Hopkins*, 56 F.3d 873, 876 (8th Cir. 1995).

In addition to the requirement of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim. "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman*, 501 U.S. at 729). "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 729-30.

Once a claim is defaulted, the habeas court can only consider the claim if the petitioner can

show cause for the default and actual prejudice, or that the default will result in a fundamental miscarriage of justice. *Sawyer v. Whitley*, 505 U.S. 333, 338-39 (1992). "[T]he cause standard requires the petitioner to show that some 'objective factor external to the defense impeded counsel's efforts' to raise the claim in state court." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991)(internal quotations and citations omitted). Examples of cause include constitutionally ineffective assistance of counsel, an unavailable factual or legal basis for a claim, or interference by state officials that made complying with the exhaustion requirements impracticable. *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986). The petitioner must also show that the errors not only created possible prejudice, "'but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" 477 U.S. at 494 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). A habeas court may bypass complex procedural issues if it is more efficient: "[j]udicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). *See also Trussell v. Bowersox*, 447 F.3d 588, 590-91 (8th Cir. 2006).

Here, Dansby argues that the Respondent has no viable procedural default defense to the *Brady-Napue* claim for three main reasons: 1) Dansby claims that the Respondent has irrevocably waived or forfeited the issue of procedural default; 2) Dansby claims that there is no procedural default because viable state-court remedies remain available; and, 3) Dansby claims that he can show cause and prejudice to excuse any procedural default of his prosecutorial misconduct claim. Finally, Dansby argues that this Court should hold an evidentiary hearing on the prosecutorial misconduct claim – both as to the procedural default issue and on the merits of the claim.

### 1. Waiver

The Eighth Circuit has held that the Respondent never raised procedural default as a defense to the *Brady-Napue* claim. *Dansby*, 766 F.3d at 823-25. Further, Dansby claims, the Respondent "made an intentional, strategic decision to forego relying on procedural default as a defense."

While it is true that Supreme Court precedent holds that habeas courts lack the authority "to override a State's deliberate waiver" of a procedural defense, *Day v. McDonough*, 547 U.S. 198, 202 (2006), this Court finds the instant facts distinguishable from such holdings as there is no evidence of a deliberate waiver of procedural default. Here, while the response did contend the *Brady-Napue* claim was correctly decided "on the merits" by the state court, the response also incorporated its arguments to the first claim contained in two prior responses which addressed the failure to site any federal law or to assert constitutional error in state court. (ECF No. 28 at 5). Although, as the Eighth Circuit has held, this incorporation is not sufficient to provide notice of an assertion of procedural default, the incorporation *does* support the Respondent's argument that its failure to argue procedural default was *not* a *deliberate* waiver of the defense.

### 2. State Court Remedies

Dansby also claims that there is no procedural default of the *Brady-Napue* claim because viable state court remedies remain. Specifically, Dansby argues that *coram nobis* relief is an available remedy.

The Eighth Circuit has explained:

A habeas petitioner is required to pursue all available avenues of relief in the state courts before the federal courts will consider a claim. If a petitioner fails to exhaust state remedies and the court to which he should have presented his claim would now find it procedurally barred, there is a procedural default. If a federal

25

court is unsure whether a claim would be rejected by the state courts, the habeas proceeding should be dismissed without prejudice or stayed while the claim is fairly presented to them.   If, however, it is clear that the state courts would find the claim to be procedurally barred and that a return to the state courts would be futile, the federal court may consider an unexhausted claim.   A petitioner could then try to overcome any procedural default by showing cause and prejudice or actual innocence.

*Sloan v. Delo*, 54 F.3d 1371, 1381-82 (8th Cir. 1995)(citations omitted).

Because dismissing unexhausted claims may result in the expiration of the statute of limitations provided in 28 U.S.C. § 2244(d)(1), the Supreme Court has recognized that a district court may stay a § 2254 petition and hold it in abeyance while the petitioner returns to state court to exhaust his previously unexhausted claims.   *Rhines v. Weber*, 544 U.S. 269, 275 (2005).   The Court has recognized, though, that the stay and abey procedure, if employed too frequently, could undermine the goal of reducing delays in the execution of sentences and encouraging petitioners to seek relief from state courts in the first instance.   *Id*. at 277.   District courts may employ this procedure only if there is good cause for a petitioner's failure to exhaust his claims, the unexhausted claims are not "plainly meritless," and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics.   *Id*. at 277-78.

"A writ of error coram nobis is an extraordinarily rare remedy, more known for its denial than its approval."   *Newman v. State*, 354 S.W.3d 61, 65 (Ark. 2009).

Coram nobis proceedings are attended by a strong presumption that the judgment of conviction is valid.   The function of the writ is to secure relief from a judgment rendered while there existed some fact that would have prevented its rendition if it had been known to the circuit court and which, through no negligence or fault of the defendant, was not brought forward before rendition of judgment.

*Newman*, 354 S.W.3d at 65.   Therefore, "[t]o warrant a writ of error coram nobis, the petition must present some fact, extrinsic to the record, that was not known at the time of trial."   *Sparks*

*v. State*, 2012 Ark. 464, at 2 (2012).   In Arkansas, a writ of error *coram nobis* is available to address errors in four categories: insanity at the time of trial, a coerced guilty plea, material evidence withheld by the prosecutor, or a third party confession to the crime during the time between conviction and appeal.   *Newman*, 354 S.W.3d at 65.   The petitioner must exercise due diligence in applying for relief, which means that he must have been unaware of the fact at the time of trial, he could not have presented the fact at trial, and after discovering the fact, he did not delay in bringing the petition.   *Id*.

A circuit court may entertain such a petition only after the Arkansas Supreme Court grants permission.   *Sparks*, 2012 Ark. 464, at 2.   The Arkansas Supreme Court will grant permission "only when it appears the proposed attack on the judgment is meritorious."   *Id*.   In determining whether the proposed attack appears to be meritorious, the court looks to "the reasonableness of the allegations of the petition and to the existence of the probability of the truth thereof." *Newman*, 354 S.W.3d at 65.   "The burden is on the petitioner to show that the writ is warranted, and a bare assertion with no factual support does not justify reinvesting jurisdiction in the circuit court to consider a petition for writ of error coram nobis."   *Pitts v. State*, 2014 Ark. 132, at 4 (2014).

Here, the Court finds that burden has *not* been met.   Dansby's prosecutorial misconduct claims do not appear meritorious.   With respect to the alleged *Brady* violation concerning impeachment evidence, the Court finds no "reasonable probability that the judgment of conviction would not have been rendered, or would have been prevented, had the exculpatory evidence been disclosed at trial."   *State v. Larimore*, 17 S.W.3d 87, 93-94 (Ark. 2000).   Even if the impeachment evidence at issue had been presented to the jury, just as evidenced above in the

discussion of Dansby's Confrontation Clause claim, the Court finds ample eyewitness and forensic proof for conviction.

Similarly, had McDuffie testified in a way consistent with his 2005 affidavit, the Court finds no reasonable likelihood that Dansby's conviction would have been affected. The eye witness, forensic proof, and Dansby's police confession simply outweigh a less than credible version of events by McDuffie.

In addition, the Court finds Dansby's diligence in pursuing *coram nobis* relief lacking. Defense counsel knew of Dansby's cooperation with law enforcement at the time of trial and knew of McDuffie's alleged recantation of his testimony at least as of the date of the affidavit – 2005. Dansby could have pursued *coram nobis* relief through the state court many years ago.

### 3.  Cause and Prejudice

As set forth above, procedural default can be overcome if a petitioner can show cause for the default and actual prejudice, or that the procedural default will result in a fundamental miscarriage of justice. *Sawyer v. Whitley*, 505 U.S. 333, 338-39 (1992). Further, *possible* prejudice is not sufficient, the petitioner must show the errors "'worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

For the same reasons established above the Court simply finds no proof to support a finding of "prejudice" necessary to overcome a procedural default.

### 4.  Evidentiary Hearing

Dansby also argues that the Court should hold an evidentiary hearing on his *Brady-Napue* prosecutorial misconduct claim – both as to the procedural default issue and on the merits of the

claim. Dansby cites, in support of his argument, *Sasser v. Hobbs*, 735 F.3d 833, 853-54 (8th Cir. 2013). In *Sasser* the Eighth Circuit held that Sasser's postconviction counsel's alleged ineffectiveness, if proved, established "'cause for any procedural default [Sasser] may have committed in not presenting these claims to the [Arkansas] courts in the first instance.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 420, 444 (2000)). Further, the Eighth Circuit found that an evidentiary hearing was required under *Trevino v. Thaler*, 569 U.S. 413 (2013), as the claim, if proven, was potentially meritorious.

This case is distinguishable, because, as set forth above, even if taken at face value Dansby's prosecutorial misconduct claims do *not* appear meritorious.

## C. Merits

Finally, as set forth above, a habeas court may bypass complex procedural issues if it is more efficient: "[j]udicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). *See also Trussell v. Bowersox*, 447 F.3d 588, 590-91 (8th Cir. 2006). Here, the Court finds that Dansby's *Brady-Napue* claim is simply not meritorious. The Court does not find McDuffie's late recantation credible,[7] particularly with respect to the alleged State involvement and procurement[8] of McDuffie's "false testimony."

---

[7] *See* supra footnote 3 and accompanying text. Considering the typical nature of jailhouse informants, the Court finds it possible, if not likely, that if Dansby received a new trial based on McDuffie's recantation, McDuffie could again very well revert to his original testimony if such testimony benefitted him under the circumstances at that time.

[8] During the omnibus hearing, the trial court heard extensive testimony from several witnesses concerning the circumstances surrounding McDuffie's initial contact with the State concerning Dansby's alleged jailhouse statements to him. Testimony was received from Municipal Judge George Van Hook, Jr.; attorney George Taylor; Michael Hill, Lieutenant with the El Dorado Police Department; Kenny Hickman, Sergeant with the El Dorado Police Department; and, Bill Hickman, Captain with the El Dorado Police Department. (ECF No. 15-2 at 22-50). In order for McDuffie's affidavit recanting his trial testimony to be credible, the testimony of each of those witnesses must be found to be *not* credible. The Court has no reason to make that finding.

*See, i.e., United States v. Rouse*, 410 F.3d 1005, 1009 (8th Cir. 2004)("When the claim of newly discovered evidence is based on a recantation, the district court must first determine whether the recantation is credible.").

## V.  CONCLUSION

The Court finds that Claim II of Petitioner's second amended petition for writ of habeas corpus should be, and hereby is, **GRANTED in part and DENIED in part** as set forth below**.**

For the reasons in this Memorandum Opinion and Order, Claim III of the second amended petition for writ of habeas corpus is **DENIED**.

For the reasons in this Memorandum Opinion and Order, Claim II of the second amended petition for writ of habeas corpus is **DENIED** with respect to his conviction of capital murder. However, Claim II is **GRANTED** with respect to Dansby's sentence of death by lethal injection. Dansby's sentence is overturned and the Respondent is ordered to either stipulate to a sentence of life imprisonment without parole or pursue the sentence of death by lethal injection through whatever remedies available to it.   The Court instructs the Respondent to determine its course of action within ninety (90) days; and if, it decides to pursue a sentence of death by lethal injection, to pursue such remedies within another an additional one hundred eighty (180) days.

The Court further notes that in accordance with Rule 11 of the Rules Governing § 2254 Cases, the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."   Under 28 U.S.C. § 2254, a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."   "A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings."   *Cox v. Norri*, 133 F.3d

565, 569 (8th Cir. 1997). As this Court finds no such substantial showing, a certificate of appealability is **DENIED**.

      **IT IS SO ORDERED** this 21st day of August 2019.

/s/ Robert T. Dawson           
ROBERT T. DAWSON
SENIOR U.S. DISTRICT JUDGE
